JUDGE KARAS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
PAMELA H. BORDEN,

                  Plaintiff,

– against –

VERIZON SICKNESS AND ACCIDENT DISABILITY
PLAN FOR NEW YORK ASSOCIATES, VERIZON
LONG-TERM DISABILITY PLAN FOR NEW YORK
AND NEW ENGLAND ASSOCIATES, VERIZON
PENSION PLAN FOR NEW YORK AND NEW
ENGLAND ASSOCIATES, VERIZON MEDICAL
PLAN, VERIZON CLAIMS REVIEW COMMITTEE,
VERIZON COMMUNICATIONS, INC., AND AETNA
LIFE INSURANCE COMPANY

                  Defendants.
--------------------------------------------------------------X

08 CIV 6429

Civil Action No.:

COMPLAINT

      Plaintiff, Pamela H. Borden, by her attorneys, BINDER & BINDER, P.C., for her Complaint against the Defendants, Verizon Sickness and Accident Disability Plan for New York Associates (the "Sickness Plan"), Verizon Long-Term Disability Plan for New York and New England Associates (the "LTD Plan"), Verizon Pension Plan for New York and New England Associates (the "Pension Plan"), Verizon Medical Plan (the "Medical Plan"), Verizon Claims Review Committee (the "Committee"), Verizon Communications, Inc. ("Verizon"), and Aetna Life Insurance Company ("Aetna"), hereby alleges as follows:

### JURISDICTION AND VENUE

      1.     Jurisdiction of the Court is based upon 29 U.S.C. §§ 1132(e)(1) and 1132(f), which give the District Courts jurisdiction to hear civil actions brought to recover benefits due under the terms of an employee welfare benefit plan. In addition, this action may be brought before this Court pursuant to 28 U.S.C. § 1331, which gives the District Court jurisdiction over actions that arise under the laws of the United States.

2. Under the Employee Retirement Income Security Act of 1974 (29 U.S.C. §§ 1001, *et seq*.) ("ERISA"), the Sickness Plan, LTD Plan and Pension Plan at issue in this litigation must contain provisions for administrative or internal appeal of denial of benefits. Plaintiff has exhausted all administrative avenues of appeal and has received a final denial. Therefore, this matter is properly before this court for *de novo* judicial review under Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989).

3. Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2) which allows an action under Title I of ERISA, as amended, to be brought in the district where the plan is administered, where the breach took place or where a defendant resides or may be found.

4. Verizon Communications Inc. is the named Plan Sponsor, with an office located at 4 West Red Oak Lane, White Plains, New York 10604. Therefore, venue is proper in the Southern District of New York because that is where the LTD Plan is administered.

## NATURE OF ACTION

5. This is a claim seeking a declaration that Plaintiff is entitled to disability income and pension benefits pursuant to the terms and conditions of employee benefit welfare plans.

6. The Sickness Plan provides sickness disability benefits to employees of Verizon Communications Inc. As such, the Sickness Plan is an employee benefit welfare plan established and maintained by an employer or employee organization for the benefit of its employees, and ERISA applies to this action. Said benefits were effective at all times relevant hereto.

7. The LTD Plan provides long term disability benefits to employees of Verizon Communications Inc. As such, the LTD Plan is an employee benefit welfare plan established and maintained by an employer or employee organization for the benefit of its employees, and ERISA applies to this action. Said benefits were effective at all times relevant hereto.

8. The Pension Plan provides disability pension benefits to employees of Verizon Communications Inc. As such the Pension Plan is an employee benefit welfare plan established and maintained by an employer or employee organization for the benefit of its employees, and ERISA applies to this action. Said benefits were effective at all times relevant hereto.

9. Claims for benefits are paid by Verizon Communications, Inc.

10. This is also a claim seeking a declaration that Plaintiff is entitled to benefits, in the form of continuation of coverage under the terms and conditions of the Medical Plan as a result of her disability.

## THE PARTIES

11. Plaintiff was born in November 1956, is presently 51 years old, and is a resident of New Rochelle, New York.

12. Defendant, the Sickness Plan, is an employee benefit welfare plan, as defined by ERISA, providing disability benefits to eligible plan participants. The Verizon Employee Benefits Center is the named Plan Administrator of the Sickness Plan and the agent for service of legal process, with a home office located at the following address: Chairperson of the VEBC, c/o Verizon Benefits Center, 100 Half Day Road, P.O. Box 1457, Lincolnshire, Illinois 60069-1457.

13. Defendant, the LTD Plan, is an employee benefit welfare plan, as defined by ERISA, providing disability income benefits to eligible plan participants. The Verizon Employee Benefits Center is the named Plan Administrator of the Sickness Plan and the agent for service of legal process, with a home office located at the following address: Chairperson of the VEBC, c/o Verizon Benefits Center, 100 Half Day Road, P.O. Box 1457, Lincolnshire, Illinois 60069-1457.

14. Defendant, the Pension Plan, is an employee welfare benefit plan, as defined by ERISA. The Verizon Employee Benefits Center is the named Plan Administrator of the Sickness Plan and the agent for service of legal process, with a home office located at the following address: Chairperson of the VEBC, c/o Verizon Benefits Center, 100 Half Day Road, P.O. Box 1457, Lincolnshire, Illinois 60069-1457.

15. Defendant, the Medical Plan, is an employee benefit welfare plan, as defined by ERISA, providing medical/health care benefits to eligible plan participants. Upon information and belief, the Verizon Employee Benefits Center is the named Plan Administrator for the Medical Plan and the agent for service of legal process, with a home office located at the

following address: Chairperson of the VEBC, c/o Verizon Benefits Center, 100 Half Day Road, P.O. Box 1457, Lincolnshire, Illinois 60069-1457.

16. Defendant, the Committee is the claims and appeals administrator for the Sickness Plan, the LTD Plan and the Pension Plan. The Committee's address is 100 Half Day Road, P.O. Box 1457, Lincolnshire, Illinois 60069-1457.

17. Defendant, Verizon, is the Plan Sponsor, responsible for paying benefits under the Sickness and LTD Plans. Verizon's address is 4 West Red Oak Lane, White Plains, New York 10604.

18. Defendant, Aetna, is an incorporated insurance company licensed to conduct the business of insurance in New York. Upon information and belief, Aetna is the Benefits Administrator for the Sickness Plan and LTD Plan, responsible for determining benefit payments. Aetna is also the Claims Administrator for the LTD Plan, responsible for determining the scope and amount of benefits. Aetna's address is 151 Farmington Avenue, Hartford, Connecticut 06156.

### STATEMENT OF FACTS

Plaintiff's Occupation:

19. Plaintiff became an employee of New York Telephone Company, which later became Verizon New York, Inc., on August 17, 1981. Plaintiff continued working for Verizon New York, Inc., through January 29, 2001, on which date she became disabled. As such, she was a covered participant in the Sickness Plan, LTD Plan and Pension Plan.

20. On December 29, 2001, Plaintiff accepted a separation offer under the Verizon Income Protection Plan and terminated her employment on that date.

21. Prior to and including January 29, 2001, Plaintiff was employed by Verizon New York, Inc. as a Customer Service Administrator. In this capacity, Plaintiff was responsible for receiving telephone calls regarding problems with telephone lines; typing customers' information into a computer; and repairing out of service telephone lines either in the central office or with the repair technician.

22. Plaintiff's pre-disability income was about $50,414.00 per year.

23. For the period beginning prior to January 29, 2001, and at all relevant times hereto, Plaintiff, together with other regular employees of Verizon New York, Inc., was covered as a participant under the Sickness Plan, the LTD Plan, the Pension Plan and the Medical Plan.

The Terms of the Sickness Plan:

24. The Sickness Plan provides for weekly disability benefits to eligible employees.

25. Verizon pays all claims under the Sickness Plan out of the operating expenses of the Company. As the insurer of the Sickness Plan, Verizon pays Sickness disability benefits out of its own coffers. In this position, Verizon could significantly reduce its operating expenses, and increase its profits, simply by denying claims. This would be a direct dollar-for-dollar effect. As such, Verizon is operating under a significant conflict of interest which had a material effect on its decision on this claim.

26. Sickness disability benefits are to commence on the eighth consecutive calendar day of an employee's absence from work.

27. The maximum benefit period under the Sickness Plan is 52-weeks.

28. In the instant matter, Plaintiff received sickness disability benefits from October 23, 2000, through December 3, 2000. Plaintiff then returned to work for less than 13-weeks (from December 4, 2000, through January 28, 2001) and suffered a recurrence of her disability and received additional sickness disability benefits from February 5, 2001, through August 28, 2001.

29. Since Ms. Borden's return to work was for less than 13-weeks, both periods of disability count toward her 52-week maximum period.

30. For employees with 15 years of Net Credited Service (15 years but less than 20 years), the Sickness Plan provides for disability benefits in the amount of the employee's full pay for 26 weeks and in the amount of half the employee's pay for the remaining 26 weeks.

31. For employees with 20 years of Net Credited Service (20 years but less than 25 years), the Sickness Plan provides for disability benefits in the amount of the employee's full pay for 39 weeks and in the amount of half of the employee's pay for the remaining 13 weeks.

32. In order to receive disability benefits under the Sickness Plan, an employee must:

- *Be under a qualified physician's care.*
- *Receive proper medical treatment.*
- *Take proper care of yourself*
- *Be certified as disabled by the claims administrator...*
- *Obtain permission from the claims administrator if you plan to recuperate away from home at any time during your absence.*

33. Benefits under the Sickness Plan are reduced by Workers' Compensation disability payments and state-mandated disability payments.

34. If the employee is represented by the Communications Workers of America AFL-CIO ("Union"), the employee may be eligible for a third medical opinion. With regard to disputes as to an employee's medical condition, the Sickness Plans states:

> *When there is a disagreement between the Company and you or your Union over your medical condition, which your Union claims will affect your wages or Sickness or Accident Disability benefits, you will be examined by a third doctor who is acceptable to both the Union and the Company. The Company will pay for your examination. The doctor's opinion will be limited to your clinical condition and will determine whether you are eligible for wages or Sickness or Accident Disability benefits.*

35. With regard to disputes over an employee's ability to return to work, "your Union must notify the Company in writing within 21 days of receipt of its first weekly notice that it wishes to submit the dispute to a third doctor. . ... The third doctor's conclusion is binding on the Company and the Union. However, if the doctor determines you can return to work, the Company will determine whether it can provide work for you within any restrictions imposed by the third doctor's conclusion. If the Company determines it cannot provide such work for you, you will receive disability benefits."

The Terms of the LTD Plan:

36.   Verizon pays all claims under the LTD Plan out of the operating expenses of the Company. As the insurer of the LTD Plan, Verizon pays LTD benefits out of its own coffers. In this position, Verizon could significantly reduce its operating expenses, and increase its profits, simply by denying claims. This would be a direct dollar-for-dollar effect. As such, Verizon is operating under a significant conflict of interest which had a material effect on its decision on this claim.

37.   The LTD Plan provides for payment of monthly benefits to eligible employees, and is designed to protect employees against a loss of earned income during periods of extended disability. Immediately prior to the onset of her disability, Plaintiff was an active employee who was regularly scheduled to work 25 or more hours per week.

38.   Plaintiff's benefit equals 50% of her monthly pay at the time her disability commenced reduced by certain offsets, which include disability benefits received pursuant to the Social Security Act.

39.   In Plaintiff's case, the LTD Plan provides for a benefit of approximately $2,100.58 per month, less the amount of the offsets, as defined by the LTD Plan.

40.   Long Term Disability benefits are to commence after Plaintiff has received 52 weeks of Sickness Disability benefits.

41.   In the instant matter, Plaintiff's should have received Long Term Disability benefits beginning on December 26, 2001.

42.   The maximum benefit period under the LTD Plan extends to the claimant's 65th birthday, provided the period of total disability begins prior to age 60, which is the case herein.

43.   The LTD Plan defines "Total Disability" as follows:

*Under the LTD Plan, you are considered to be totally disabled if, during the period immediately following the waiting period:*

– *Your sickness or injury (other than accidental injury arising out of and in the course of employment with a participating company) prevents you from engaging in any occupation or employment for which you are qualified or may reasonably become qualified based on training, education or experience.*

> — *You are incapable of performing the requirements of a job other than one for which the rate of pay is less than 50 percent of your Benefit Bearing Wage at the time you became disabled.*

44. The LTD Plan also requires the employee to "be under the care of a qualified physician who must provide appropriate documentation of your disability. You also must take proper care of yourself and receive proper medical treatment."

45. The LTD Plan requires Plaintiff to apply for Social Security Disability benefits.

46. Moreover, the Social Security Disability benefit or an estimated benefit will be deducted from Plaintiff's LTD benefit.

Terms of the Pension Plan:

47. The Pension Plan provides for early retirement benefits if an employee becomes totally disabled.

48. With regard to eligibility, the Pension Plan states that:

*A Participant shall be eligible for a Disability Pension if he or she becomes totally disabled as a result of sickness or injury, other than accidental injury arising out of and in the course of employment with a Participating Company —*

*(1) while he or she is an Eligible Employee after earning Net Credited Service of at least 15 years, but*

*(2) before Normal Retirement Age and before becoming eligible for a Service Pension.*

49. Additionally, according to the Pension Plan's Summary Plan Description, Plaintiff must remain totally disabled after receiving 52 weeks of sickness benefits under the Sickness Plan. As such, Disability Pension benefits are to commence after Plaintiff has received sickness benefits under the Sickness Plan for 52-weeks.

50. The Pension Plan defines Normal Retirement Age as "age 65 or, if later, the fifth anniversary of the date on which an Employee becomes a Participant under the Plan . . .."

51. In order to be eligible for a Service Pension, Plaintiff must meet one of the following sets of Net Credited Service and age criteria while an Employee prior to Separation from Service:

      (1)    30 years and any age;

      (2)    25 years and age 50;

      (3)    20 years and age 55;

      (4)    15 years and age 60, or

      (5)    10 years and age 65.

52. The Pension Plan defines totally disabled as being "unable to perform any job for the Company or an Affiliate which is offered to the Participant by the Participating Company for which the Participant most recently provided service.

53. The amount of Plaintiff's Disability Pension benefit is equal to the amount of an unreduced Service Pension. According to the Pension Plan's Summary Plan Description, "There is no reduction for early payment regardless of your age when you terminate your employment."

54. The Service Pension is the sum of the Basic Monthly Pension Benefit and the Supplemental Monthly Pension Benefit.

55. The Basic Monthly Pension Benefit is calculated by multiplying (1) the basic monthly pension benefit in effect for Plaintiff's pension band on the determination date by (2) Plaintiff's pension accrual service.

56. The Supplemental Monthly Pension Benefit is equal to the product of (1) the average annual supplemental payments you received in the 36 months prior to Plaintiff's benefit determination date; (2) .001; and (3) the years and months of pension accrual service.

57. For Basic Monthly Pension purposes, according to the Verizon Claims Review Unit, Ms. Borden is eligible for Pension Band Number 117 when she terminated employment.

58. In Plaintiff's case, the Pension Plan provides for a disability pension benefit of approximately $1,217.86 per month.

59. In the instant matter, Plaintiff should have received Disability Pension benefits beginning on December 26, 2001.

60. The Pension Plan provides for disability pension benefits as long as Plaintiff remains unable to resume active employment with Verizon or until normal retirement age – at

which point, "the disability pension will be changed to a service pension in the same monthly amount and in the same form of payment that you elected when your disability pension began."

Plaintiff's Disability:

61. Plaintiff was forced to stop working on January 29, 2001, due to Cervical Spine Impairments, Cervical Radiculopathy, Lumbar Spine Derangement, Lumbar Radiculopathy, Migraine Headaches, Disequilibrium Problems and Generalized Anxiety Disorder.

62. Plaintiff was diagnosed with the above medical conditions by her various treating physicians.

63. An MRI of the cervical spine dated March 22, 2000, revealed a right paracentral herniated nucleus pulposus at C3-4 and C4-5, impressing on the ventral aspect of the thecal sac.

64. As a result of her severe neck pain, Plaintiff underwent Cervical Epidural Steroid Injections on June 23, 2000, July 14, 2000, September 8, 2000, February 16, 2001, and February 26, 2001.

65. Aside from the injections, as a result of her unrelenting pain, Plaintiff's pain management specialist prescribed Ultram, Celebrex, Elavil, Amitriptyline and Imitrex.

66. In a note dated October 29, 2001, the treating pain management specialist noted that Ms. Borden suffers from severe neck pain radiating to the upper back and both arms with associated hypersensitivity at the elbow. The pain management specialist also stated that Plaintiff's pain is worse with turning, flexing and extending her neck; she suffers from vertigo and anxiety; had very limited success with multiple medications and physical therapy; and she has great difficulty maintaining any position for more than a few moments.

67. Plaintiff also received treatment from a neurologist for her multiple medical conditions. In a report dated July 7, 2003, the treating neurologist noted that Ms. Borden complained of vertigo; neck pain; low back pain; left jaw pain; inability to sit and/or stand for any protracted period of time; inability to work because of severe low back and neck pain; severe frequent migraine headaches; and left Carpal Tunnel Syndrome. Upon examination, the treating neurologist noted spontaneous left sided facial pains; markedly limited cervical range of motion

secondary to pain; decreased lumbar range of motion; inability to sit and/or stand for any time; and increased dizziness with head movements.

68. In a report dated May 16, 2001, Aetna's independent medical examiner determined that Plaintiff was disabled from returning to work at that time as a result of her disequilibrium problems. Further, when asked about Ms. Borden's specific functional capacity, the examiner stated that Ms. Borden can perform "No work."

69. In a report dated May 5, 2003, Plaintiff's orthopedist diagnosed her with cervical herniated discs at C3-4 and C4-5; cervical derangement and radiculopathy, cervical torticollis and lumbar derangement and radiculopathy. Upon examination of the cervical spine, the orthopedist noted decreased extension with pain; pain upon right rotation; restricted range of motion on left rotation with pain in the supraclavicular area; pain with spasm in the left trapezius with paresthesias radiating distally; restricted lateral bending with left trapezial muscle spasm; paresthesia in the left hand with thenar atrophy; decreased grip on the left; and decreased sensation in the 1st and 2nd fingers of the left hand. Upon examination of the lumbar spine, the orthopedist noted decreased extension of the lumbar spine with paralumbar muscle spasm; pain on right and left lateral bending; and pain on straight leg raising on the right and left.

70. In the same report, the orthopedist noted a guarded prognosis and stated,

> *Regarding the cervical spine, the patient sustained a permanent orthopedic disability demonstrated by MRI revealing herniated discs at multiple levels with impingement on the thecal sac. In association, there is clinical evidence of a cervical nerve radiculopathy. With both disc and nerve involvement the patient exhibits a painful functional restriction of motion by more than 30% accompanied by spasm, guarding, radiation, reflex deficits and now a torticollis with pain and atrophy and weakness in the cervical spine and left upper extremity.*
>
> *Regarding the lumbar spine the patient sustained a permanent orthopedic disability demonstrated by a painful functional restriction of motion by more than 20% associated with and resulting from clinical evidence of a disc herniation and lumbar radiculopathy with reflex deficits and weakness.*
>
> *In my opinion the injuries to her cervical and lumbar spines prevents her from working in any capacity that requires her to drive, look up or to the right or left repetitive times, lift, bend, climb, carry more than 5 pounds, walk more than 1-2 blocks, and running and jumping are virtually impossible to do as a result of severe and incapacitating pain. I feel she is permanently disabled and should receive Long Term Disability.*

71. Plaintiff also underwent acupuncture and physical therapy in an attempt to reduce her pain and other symptoms.

72. With regard to her psychological impairments, in a note dated April 18, 2002, Ms. Borden's treating psychologist stated that Plaintiff suffers from anxiety and depression, which is associated with her serious physical disabilities.

73. In a Psychiatric/Psychological Impairment Questionnaire dated September 9, 2002, Plaintiff's treating psychologist diagnosed Ms. Borden with Generalized Anxiety Disorder with a Global Assessment of Functioning score of 50. The treating psychologist noted that Ms. Borden suffers from sleep disturbance, mood disturbance, emotional lability, feelings of guilt/worthlessness, difficulty thinking or concentrating, perceptual disturbances, decreased energy, generalized persistent anxiety, somatization unexplained by organic disturbance and hostility and irritability.

74. In the same Questionnaire, the treating psychologist noted marked limitations (effectively precluded) in Plaintiff's abilities to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; sustain ordinary routine without supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting.

75. The treating psychologist also noted moderate limitations (significantly affects but does not totally preclude ability) in Plaintiff's abilities to understand and remember detailed instructions; carry out detailed instructions; and travel to unfamiliar places or use public transportation. The treating psychologist noted that when Ms. Borden turns her head, she experiences loss of equilibrium and intense pain from the neck to the elbow and wrist and to the knee occasionally. The treating psychologist also stated Plaintiff is not able to work consistently as she would frequently be out of work for several days to weeks at a time.

76. In connection with her various medical impairments, Plaintiff has received, and continues to receive, appropriate medical treatment for her medical conditions from her treating physicians.

### PLAINTIFF'S FIRST CAUSE OF ACTION FOR <u>SICKNESS BENEFITS</u>

77. With regard to Plaintiff's claim for benefits under the Sickness Plan, she continued to work through January 29, 2001.

78. On January 29, 2001, Plaintiff was forced to stop working due to Cervical Spine Impairments, Cervical Radiculopathy, Lumbar Spine Derangement, Lumbar Radiculopathy, Migraine Headaches, Disequilibrium Problems and Generalized Anxiety Disorder.

79. In compliance with the terms and conditions of the Sickness Plan, Plaintiff timely applied for sickness benefits.

80. Prior to January 29, 2001, Ms. Borden received Sickness Disability benefits from October 23, 2000, through December 3, 2000. After an unsuccessful attempt to return to work, Ms. Borden again went out on disability on January 29, 2001. Ms. Borden's claim for sickness benefits was then approved from February 5, 2001 (the eighth consecutive calendar day of an employee's absence from work), through August 28, 2001.

81. Since Plaintiff suffered a recurrence of her disability within the first 13-weeks of her return to work, both periods of disability count toward her 52-week maximum. As such, Ms. Borden received 35-weeks of Sickness Disability benefits.

82. By letter dated August 29, 2001, Aetna, on behalf of the Verizon Disability Center, terminated Plaintiff's sickness disability benefits effective August 28, 2001, because Ms. Borden allegedly failed to provide sufficient clinical information to indicate that she continued to be disabled from working.

83. Via letter dated September 13, 2001, Plaintiff appealed the denial of her claim for sickness disability benefits.

84. By letter dated January 29, 2002, Aetna upheld the decision to terminate Plaintiff's sickness benefits effective August 28, 2001.

85. This adverse determination was based on the opinion of Aetna's Medical Director, who concluded that there were no physical impairments that would have precluded Plaintiff from returning to work.

86. As a file review consultant, Aetna's Medical Director never examined Plaintiff and as such, her opinion is medically inferior and scientifically unreliable as compared to the opinions of the claimant's treating doctors. Moreover, Aetna's Medical Director had a pecuniary interest in finding Plaintiff not disabled.

87. Aetna failed to send Plaintiff for an Independent Medical Examination as it had done in the past. As a result, the only scientifically and medically acceptable evidence has been provided by Ms. Borden's treating doctors, all of whom found her to be totally disabled.

88. Following Plaintiff's second request for review, the Verizon Claim Review Committee issued a final decision to terminate Plaintiff's sickness disability benefits via letter dated July 22, 2002.

89. This adverse determination was based on the opinion of the Committee's file review physician, Delphine A. McMaster, M.D., who concluded that there was "no objective clinical findings to support disability benefits under the Verizon Sickness and Accident Disability Benefit Plan for New York Associates."

90. While the Sickness Plan does not require objective evidence as proof of disability, Verizon nonetheless erroneously added this substantive term to the Sickness Plan by requiring the presence of objective clinical findings.

91. As a file review consultant, Dr. McMaster never examined Plaintiff and as such, her opinion is medically inferior and scientifically unreliable as compared to the opinions of the claimant's treating doctors. Moreover, Dr. McMaster had a pecuniary interest in finding Plaintiff not disabled.

92. Verizon also failed to send Plaintiff for an Independent Medical Examination as permitted by the Sickness Plan. Again, the only scientifically and medically acceptable evidence has been provided by Ms. Borden's treating doctors, all of whom found her to be totally disabled.

93. By letter dated October 20, 2003, Plaintiff, through counsel, inquired as to whether or not the Committee would consider additional documentation in support of Ms. Borden's claim for continued Sickness benefits.

94. The Verizon Claims Review Unit, via letter dated November 20, 2003, advised that the Committee would consider "new and relevant" information in support of Ms. Borden's appeal.

95. By letter dated December 6, 2005, Plaintiff, through counsel, submitted additional medical documentation and comments in support of Plaintiff's claim for continued Sickness benefits.

96. By letter dated February 13, 2006, the Committee issued a final denial of Plaintiff's claim for benefits under the Sickness Policy.

97. For at least the third time, Verizon chose to not to have Plaintiff examined. As such, any opinions rendered by the Medical Director are medically inferior and scientifically unreliable as compared to the opinions of Ms. Borden's treating physicians, who have examined her on countless occasions and opined that she is totally disabled.

98. Additionally, Plaintiff applied for and was awarded Social Security Disability Benefits by the Social Security Administration ("SSA"). In a Fully Favorable Decision dated October 24, 2002, Administrative Law Judge William Kirchgaessner determined that Ms. Borden was disabled since January 1, 2000. Plaintiff continues to receive Social Security Disability benefits to this date.

99. The definition of disability under the Social Security Act is more restrictive than the definition of disability found in the LTD Plan.

100. The Committee failed to reconcile the conclusion of the SSA, that Ms. Borden was totally disabled, with its conclusion that she was not totally disabled under a far less stringent definition of disability.

101. In seeking to further its own pecuniary interest, the Committee and Aetna have denied Plaintiff of her right to a full and fair review of the denial of her claim, as required by ERISA.

102. Verizon, as the insurer of the Sickness Plan, pays Sickness benefits out of its own coffers. As such, Verizon is operating under a significant conflict of interest which had a material effect on its decision-making on this claim.

103. The Committee, as the claims and appeals administrator for the Sickness Plan, is a fiduciary, as defined by ERISA, and owes a fiduciary duty to Plan participants such as Ms. Borden.

104. Fiduciaries have a statutory obligation, in performing their duties, to act prudently and solely in the interest of Plan participants and beneficiaries, and strictly in conformance with the provisions of the Plan.

105. The adverse claim decisions rendered in the instant action have been made by the Committee and Aetna, which have a pecuniary interest in denying claims. This pecuniary interest created a conflict of interest, which had a direct and important effect on the Committee's and Aetna's decision making on Ms. Borden's claim for Sickness disability benefits.

106. Fiduciaries also have a statutory obligation to fairly interpret and construe the terms of the Plan and thereby make decisions in accordance with plan language.

107. The Committee's and Aetna's decisions were not supported by the medical evidence and were not supported by the applicable plan language.

108. The Committee's and Aetna's decisions in the instant claim were not supported by the evidence submitted with Plaintiff's claim.

109. Plaintiff was and remains disabled within the terms and conditions of the Sickness Plan. Plaintiff is, therefore, entitled to the continued receipt of continued receipt of Sickness benefits from August 29, 2001, through December 25, 2001.

## PLAINTIFF'S SECOND CAUSE OF ACTION FOR
## LONG-TERM DISABILITY BENEFITS

110. Plaintiff repeats and re-alleges the allegations contained in the Paragraphs number "1" through "109," as if fully set forth herein.

111. By letter dated October 20, 2003, Plaintiff, through counsel, inquired as to whether Verizon would allow Ms. Borden to apply for Long Term Disability Benefits.

112. Via letter dated November 20, 2003, the Committee advised that, "If Ms. Borden would like to apply for LTD benefits she should contact the Verizon Benefits Center . . .."

113. Upon information and belief, the Verizon Benefits Center did not provide the necessary LTD claim forms.

114. At the Committee's instructions, Plaintiff, through counsel contacted Metropolitan Life Insurance Company to request the necessary claim forms to initiate Ms. Borden's Long Term Disability claim. However, Metropolitan Life Insurance Company advised that they have no record of Ms. Borden and they, therefore, cannot provide the forms.

115. Via letter dated December 22, 2005, Plaintiff's counsel requested that the Committee provide the LTD claim forms so that Ms. Borden can initiate a LTD claim.

116. By letter dated June 19, 2006, the Committee advised that since Ms. Borden had not exhausted her "Waiting Period" (*e.g.*, the 52-weeks of Sickness Disability benefits under the Sickness Plan) as defined by the LTD Plan, she is not entitled to LTD benefits.

117. For that reason, the Committee refused to provide Plaintiff with the LTD claim forms.

118. The Committee's failure to properly review Plaintiff's claim for sickness disability benefits under the Sickness Plan has deprived Ms. Borden of her right to LTD benefits.

119. As a result of Plaintiff's entitlement to the full 52-weeks of Sickness Disability benefits under the Sickness Plan, as detailed *supra*, and as a result of her continued disability, she is entitled to Long Term Disability benefits from December 26, 2001, through the date of a decision on this case.

### PLAINTIFF'S THIRD CAUSE OF ACTION
### FOR DISABILITY PENSION BENEFITS

120. Plaintiff repeats and re-alleges the allegations contained in the Paragraphs number "1" through "119," as if fully set forth herein.

121. Via letter dated March 29, 2007, Plaintiff, through counsel advised the Committee that Ms. Borden's Pension benefits had been underpaid. The Committee treated this letter as an ERISA claim for additional pension benefits.

122. By letters dated October 1, 2007, and October 15, 2007, the Committee denied Plaintiff's claim for disability pension benefits because she did not receive the requisite 52 weeks of Sickness Disability benefits under the Sickness Plan.

123. By letter dated November 28, 2007, Plaintiff, through counsel, appealed the Committee's October 1, and 15, 2007, denials of her claim for additional pension benefits by submitting comments and additional medical documentation.

124. Finally, by letter dated February 15, 2008, the Committee issued a final denial of Plaintiff's claim for additional pension benefits.

125. According to the Committee, Plaintiff was employed by Verizon from August 17, 1981, through December 29, 2001. As such, she had more than 15 year of Net Credited Service.

126. On December 29, 2001, Plaintiff accepted a separation offer under the Verizon Income Protection Plan and terminated her employment on that date.

127. As a result of the Committee's failure to approve her sickness disability claim, Plaintiff chose to receive her reduced pension at age 45 in the amount of about $197.00 per month.

128. On December 29, 2001, Plaintiff was 45 years old, and as such did not reach the Normal Retirement Age of 65.

129. On December 29, 2001, Plaintiff was not eligible for a Service Pension.

130. As described *supra*, Plaintiff was entitled to the full 52 weeks of sickness disability benefits under the Sickness Plan. Additionally, as described *supra*, Plaintiff continues to be totally disabled as defined by the Pension Plan.

131. As such, Plaintiff is entitled to a monthly disability pension benefit in the amount of $1,217.86 beginning December 26, 2001.

### PLAINTIFF'S FOURTH CAUSE OF ACTION
### FOR CONTINUED MEDICAL BENEFITS

132. Plaintiff repeats and re-alleges the allegations contained in the Paragraphs number "1" through "131," as if fully set forth herein.

133. Upon information and belief, the Medical Plan provides that, if Plaintiff is disabled under the LTD Plan, then her Medical coverage is continued for as long as she is disabled.

134. As a result of the Committee's erroneous termination of Ms. Borden's Sickness Disability benefits as of August 28, 2001, Plaintiff was unable to apply for LTD benefits and, therefore, deprived of her continued medical coverage under the Medical Plan.

135. Additionally, the Committee's wrongful termination of Ms. Borden's sickness disability claim has caused her to incur medical expenses that would have otherwise been covered under the Medical Plan.

136. As a result of Plaintiff's disability and entitlement to benefits under the LTD Plan, as detailed *supra*, she is entitled to continued coverage under the Medical Plan and reimbursement for the premiums paid from December 26, 2001, to the present date as well as those medical expenses, including COBRA premiums, she incurred as a result of the termination of her Sickness Disability benefits.

WHEREFORE, Plaintiff respectfully requests the following relief:

a. That the Court declare and then determine that, under the terms of the Sickness Plan, Plaintiff's disability began on January 29, 2001, and that she continues to be disabled under the terms of the Sickness Plan.

     b.     That, after making such a determination, the Court grant Plaintiff appropriate legal relief and order Defendants, the Sickness Plan, the Committee and Verizon to compensate Plaintiff for her disability in accordance with the terms of the Sickness Plan, from August 29, 2001, through December 25, 2001;

     c.     That the Court declare and then determine that, under the terms of the LTD Plan, Plaintiff's disability began on January 29, 2001, and that she continues, without interruptions, to be disabled within the terms of the LTD Plan;

     d.     That, after making such a determination, the Court grant Plaintiff appropriate legal relief and order Defendants, the LTD Plan, the Committee and Verizon to compensate Plaintiff for her disability in accordance with the terms of the LTD Plan, retroactive to December 26, 2001;

     e.     That, after making such a determination, the Court grant Plaintiff appropriate legal relief and order Defendants to compensate Plaintiff for her disability in accordance with the terms of the Pension Plan, retroactive to December 26, 2001;

     f.     That, after making such a determination, the Court grant Plaintiff appropriate legal and equitable relief and order Defendants to compensate Plaintiff in accordance with the terms of the Medical Plan, retroactive to December 26, 2001;

     g.     That the Court award Plaintiff her attorney's fees pursuant to ERISA, 29 U.S.C. §1132(g); and

     h.     That Plaintiff receive such other necessary, proper and equitable relief, including interest, costs and disbursements, as to which she may be entitled.

Dated: July 17, 2008
         Hauppauge, New York

                                      BINDER & BINDER, P.C.

                         By: *[signature]*
                             John W. DeHaan (JWD 8863)
                             300 Rabro Drive
                             Suite 101
                             Hauppauge, New York 11788
                             Telephone:  (631) 582-1200
                             Facsimile:  (631) 582-1228